740 So.2d 253 (1999)
Alvin B. ANDING, Sr., Plaintiff-Appellee,
v.
Lee ANDING and Mamie Skipper Anding, Defendants-Appellants.
No. 32,084-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 1999.
*254 Hayes, Harkey, Smith & Cascio by C. Joseph Roberts, III, Donald C. Douglas, Jr., Monroe, Counsel for Appellee, Alvin B. Anding, Sr.
Arbour & Aycock by Larry Arbour, West Monroe, Counsel for Appellant, Lee Anding.
Blackwell, Chambliss, Henry, Caldwell & Cagle by Sam O. Henry, III, West Monroe, Counsel for Appellant, Mamie Skipper Anding.
Before NORRIS, C.J., and WILLIAMS and STEWART, JJ.
STEWART, J.
Alvin B. Anding, Sr. ("Bert") sued his father, Lee Anding ("Lee") and his former step-mother, Mamie Skipper Anding ("Mamie") for collection on a promissory note and reimbursement for labor, advances, and expenses provided or paid by Bert on their behalf. In her answer, Mamie alleged collusion between Bert and Lee, asserted the affirmative defense of compensation, and asserted a cross-claim against Lee for mismanagement of community property. The trial court rejected Mamie's defenses and cross-claim and rendered a judgment granting Bert's claims in full, totaling over $260,000. Mamie now appeals. Finding no error in the trial court's judgment, we affirm.

FACTS
Lee and Mamie were married in 1968. It was a second marriage for both. At the time, Lee and Bert were engaged in a land clearing business together under the name "Lee Anding & Son." This business ceased operations in the early 1970's, at which time Lee and Bert assumed separate debts *255 incurred during the existence of Lee Anding & Son. As part of their separation, Bert assumed debts owed to Scott Truck & Tractor ("Scott"), and its various divisions, totaling approximately $140,000. Lee assumed a debt owed to Scott evidenced by a note (the "1969 note") dated December 9, 1969, for $47,612.37 payable by Lee in three annual installments to "any future holder." A mortgage on property owned by Lee secured the 1969 note. Lee also assumed a debt owed Northwestern Mutual Life Insurance Company (the "Northwestern debt") evidenced by a note dated January 13, 1969, for $70,000, payable to Northwestern by Lee and Mamie, and secured by a mortgage granted by Lee and Mamie.
On December 28, 1970, Bert pledged a note (the "1970 note") to Scott for $99,907.65, secured by a chattel mortgage in the name of Lee Anding & Son and signed by Bert. The chattel mortgage covered various items of equipment kept by Bert after the termination of Lee Anding & Son. This transaction enabled Bert to significantly reduce the $140,000 debt he assumed when Lee Anding & Son ceased operations. The remaining debt was paid after Bert began his own land clearing business known as "Anding Construction" and completed a large job clearing Cypress Black Bayou in Benton, Louisiana. Scott's representative, Sam Adams ("Adams"), worked closely with Bert throughout this job by providing financing as needed. According to Adams, Bert paid Lee $100 per week throughout the Black Bayou job even though Lee was never at the job site and was not a part of Anding Construction. Bert confirmed the payments to Lee and explained that they were made to help Lee who had no money coming in at the time. While Bert was able to manage and pay off his portion of the Scott debt, Lee made no payments on his own debts. When Lee became delinquent on the debt evidenced by the Northwestern note, Bert obtained a loan from Central Bank to pay $11,038.44 on Lee's behalf.
In the years following the termination of Lee Anding & Son, the relationship between Lee and Bert was often strained. Lee failed to pay off his debts at Scott and the debt continued to increase as interest accrued, agreements were entered to extend the maturity of the notes, and new loans were made. On August 20, 1974, Scott loaned Lee an additional $18,000 evidenced by a note payable on demand to "any future holder." In 1979, Bert signed a note (the "1979 note") payable to Lee for $76,935.69, even though Bert denied owing Lee any money. Bert explained that the 1979 note evidenced the debt which Lee then owed to Scott and that Lee insisted that Bert sign a note to him after Lee reissued his own note at Scott. Bert stated that he signed the 1979 note simply to avoid arguing with Lee in front of Adams at Scott and insisted that he did not owe any money to Lee. Bert made no payments to Lee on the 1979 note.
On July 28, 1986, Lee pledged a new note (the "1986 note") to Scott evidencing a total debt of $97,475.38. The 1986 note was payable on demand, signed by Lee, and secured by a real estate mortgage. Again, Lee made no payments on the Scott debt. By August 26, 1993, Lee's indebtedness totaled $167,651.98, and Scott was insisting that the debt be liquidated by October 1, 1993. Lee, who was 90 years old, was no longer able to manage either his cattle operation or his finances; consequently, he sought help from Bert. Bert moved to be near Lee and devoted considerable time and effort to get Lee's affairs in order. Using his own funds and borrowing additional money, Bert paid Lee's bills, including an overdue bill of $1,000 for electricity, replenished Lee's overdrawn bank account, repaired and built fences, repaired machinery and equipment, and tended to the cattle. Although Bert did not charge for his efforts at the time, Bert did keep track of his labor, expenses, and money loaned to Lee for future reimbursement. Bert obtained a note (the "1994 *256 note") dated January 12, 1994, as security from Lee. The 1994 note is for $150,000 payable on demand and is secured by a chattel mortgage.
Bert also prevented Scott's foreclosure on Lee's property. In order for Bert to obtain financing to pay off Lee's loan at Scott, Lee and Mamie executed a note (the "1993 note") dated September 24, 1993, for $167,651.98 payable on demand to "any future holder." After failing to secure alternate financing to pay off Lee's debt at Scott, Bert pledged the 1993 note to Scott in satisfaction of Lee's debt. Along with the pledge of the 1993 note, Lee and Mamie signed an agreement dated April 15, 1994, acknowledging their assignment of the 1993 note to Bert, stating that there are no defenses or offsets against it, and consenting to the pledge of the 1993 note to Scott by Bert. Thereafter, Bert managed to pay off a substantial portion of Lee's debt and to obtain the 1993 note back from Scott.
Lee and Mamie separated in March 1995, and obtained a judgment of divorce in November 1995. The instant suit followed. In reasons for judgment, the trial court determined that the litigation hinged on the following three documents: (1) the 1993 note; (2) the 1994 note; and (3) the April 15, 1994 agreement signed by Lee and Mamie. Upon finding all three of these documents valid and binding and finding that Bert proved his claim for reimbursement, the trial court rendered judgment in favor of Bert and denied Mamie's affirmative defense of compensation and her claims against Lee. Mamie now appeals.[1]

DISCUSSION

Compensation
In her first three assignments of error, Mamie challenges the trial court's rejection of her defense of compensation. This affirmative defense hinged on the 1979 note from Bert to Lee, which Mamie claimed extinguished the debt underlying the 1993 note sought to be enforced by Bert. The trial court first noted that by claiming compensation as an affirmative defense, Mamie admitted the correctness of the debt sued upon by Bert. The trial court further noted that the 1979 note was in Bert's possession and that Lee admitted that Bert owed nothing on the note. Finally, the trial court ruled that the 1979 note had prescribed, that Mamie was never a holder of the 1979 note, and that Mamie failed to prove that the obligation underlying the 1979 note was incidental to or connected with the obligation sought to be enforced by Bert.
Compensation occurs by operation of law when two person owe each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due. La. C.C. art. 1893. Compensation extinguishes both obligations to the extent of the lesser amount. Id. Mamie asserts that compensation should occur in the instant case to extinguish the obligations evidenced by the 1993 note and the 1979 note. However, the 1979 note is a note payable on demand to Lee. Furthermore, the 1979 note is a negotiable instrument as that term is defined in La. R.S. 10:3-104(a). Because the 1979 note is a negotiable instrument, it is covered under the Commercial Laws set forth in La. R.S. 10:1-101 et seq. Chenault v. C & H Enterprises, Ltd., 514 So.2d 535 (La.App. 3rd Cir.1987).
An action to enforce a demand note is barred if neither principal nor interest on the note has been paid for a continuous period of five years. La. R.S. 10:3-118(b). Similarly, actions on instruments or promissory notes, whether negotiable or not, are subject to a liberative prescription of five years. La. C.C. art. 3498. Bert made no payments of either principal or interest on the 1979 note. There is no indication in the record that Lee ever demanded payment. As such, we find no error in the *257 trial court's finding that the 1979 note is prescribed.
Even though the 1979 note is clearly prescribed, Mamie contends it may still be enforced as a defense to Bert's claim. La. C.C.P. art. 424 provides in relevant part:
A person who has a right to enforce an obligation also has a right to use his cause of action as a defense.
Except as otherwise provided herein, a prescribed obligation arising under Louisiana law may be used as a defense if it is incidental to, or connected with, the obligation sought to be enforced by the plaintiff.
Article 424 permits the use of a prescribed claim as a defense. Dixie Building Materials Co., Inc. v. Bob L. Whittington & Associates, Inc., 588 So.2d 78 (La.1991). However, Article 424 also provides that it is the person who has a right to enforce an obligation who also has the right to use the cause of action as a defense. If Mamie does not have the right to enforce the 1979 note, then she may not raise it as a defense to Bert's claim on the 1993 note.
Persons entitled to enforce an instrument or negotiable instrument include (1) the holder of the instrument, (2) a nonholder in possession of the instrument who has the rights of a holder, or (3) a person who does not possess the instrument but who is entitled to enforce the instrument pursuant to R.S. 10:3-309 or 10:3-418(d). La. R.S. 10:3-301. Mamie does not contend that she is a holder of the 1979 note nor does she contend that she fits within any other category under La. R.S. 10:3-310 which would allow her to enforce the 1979 note. Rather, Mamie contends that she is authorized to raise the defense of compensation, and thereby enforce the 1979 note, by La. C.C. arts. 2346, 2355, and 2369.7.
La. C.C. art. 2346 provides:
Each spouse acting alone may manage, control, or dispose of community property unless otherwise provided by law.
Mamie's reliance upon Article 2346 is misplaced. This article provides for equal management of community property during the existence of the community. Because the community existing between Mamie and Lee terminated upon the November 1995 judgment of divorce, Article 2346 does not apply. Reliance on La. C.C. art. 2355, which also applies during the existence of the community, is likewise misplaced.
La. C.C. art. 2369.7, which applies upon termination of the community, permits a spouse to obtain court authorization in a summary proceeding to act without the concurrence of the other spouse upon showing all of the following:
(1) The action is necessary.
(2) The action is in the best interest of the petitioning spouse and not detrimental to the interest of the nonconcurring spouse.
(3) The other spouse is an absent person or arbitrarily refuses to concur, or is unable to concur due to physical incapacity, mental incompetence, commitment, imprisonment, or temporary absence.
La. C.C. art. 2369.7. Without addressing whether this article would allow Mamie to assert the claim of compensation and enforce the 1979 note, we find that Mamie has not satisfied and has made no effort to satisfy the requirements of Article 2369.7.
Because Mamie is not a person entitled to enforce the note and because the 1979 note is prescribed, we find no error in the trial court's denial of Mamie's affirmative defense of compensation. Because Mamie is not a person entitled to enforce the 1979 note, we do not reach the issue of whether the 1979 note is incidental to or connected with the 1993 note sought to be enforced by Bert.

Liability Under La. C.C. art. 2369.3
As an alternative to her affirmative defense of compensation, Mamie asserted a *258 cross-claim against Lee for damages due to his failure to raise the defense of compensation against Bert's claims under the 1993 note. The trial court denied Mamie's cross-claim for damages upon finding that she did not satisfy the required burden of proof.
Mamie's cross-claim is based upon La. C.C. art. 2369.3 which provides:
A spouse has a duty to preserve and to manage prudently former community property under his control, including a former community enterprise, in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.
A community enterprise is a business that is not a legal entity.
The spouse alleging improper management bears the burden of proving that his spouse failed to manage and prudently preserve the former community property prior to partition. Drobnak v. Drobnak, 97,0021 (La.App. 1st Cir. 2/20/98), 708 So.2d 1162.
Because Lee failed to assert a defense of compensation based on the 1979 note from Bert against Bert's claim, Mamie contends that Lee failed to prudently preserve and manage the former community property. At the time of trial, the 1979 note was in Bert's possession. Lee had never demanded payment of the note, and Bert had never paid either the principal or interest on the note. Also, as noted previously, the 1979 note had prescribed. In order for a prescribed obligation to be asserted as a defense as provided in La. C.C.P. art. 424, the prescribed obligation must be connected with or incidental to the obligation sought to be enforced by the plaintiff. Although Mamie argues that Bert's 1979 note and Lee's 1993 note both grew out of Anding & Son's debt, the record does not support this argument.
The record does not establish the basis or purpose of the 1979 note. Bert testified that he signed the note to avoid a public argument with Lee even though he did not owe Lee any money at the time. Nothing in the record relates the 1979 note to any prior obligations between Lee and Bert stemming from the termination of Anding & Son. The 1993 note and accompanying mortgage did not stem from debt associated with Anding & Son; rather, it arose because Lee sought Bert's help to avoid financial ruin. The 1993 note was signed by Lee and Mamie and assigned to Bert in order for him to find a way to satisfy Lee's debt at Scott and prevent foreclosure on Lee and Mamie's property. Furthermore, Lee and Mamie signed an agreement related to the 1993 note in which they acknowledged their assignment of the 1993 note to Bert, their indebtedness as represented by the note, and their belief that no defenses or offsets exist against the note.
Because Mamie and Lee acknowledged that there were no offsets or defenses against the 1993 note and because nothing in the record connects the 1979 note to the 1993 note or suggests that the notes are incidental to each other, confusion is not a viable defense against enforcement of the 1993 note. Therefore, we find, as did the trial court, that Mamie failed to meet the burden of proving that Lee breached his duty to prudently preserve and manage the former community property. We find no error in the trial court's denial of this claim.

Claims of Collusion and Reimbursement for Loans, Advances, and Labor
Mamie asserts that the trial court erred in awarding Bert reimbursement for loans, advances, and labor provided throughout 1993 and 1994 to assist Lee and Mamie. Mamie argues that there were never any discussions regarding Bert charging Lee for the assistance provided and that Bert neither presented any bills nor demanded payment prior to filing suit. Mamie argues that Bert's real purpose in filing suit and pursuing the reimbursement claim is to prevent her from obtaining her fair *259 share in the partition of the former community property. In this regard, Mamie contends that Bert and Lee are in collusion against her. Mamie points out as evidence of collusion the facts that her 28 year marriage to Lee terminated over how to divide their property among their respective children, that Bert did not file suit until after she prepared a petition for partition of the community property, that Bert and his sister obtained an attorney to represent Lee in the instant litigation, and that Lee has not contested any of Bert's allegations or countered with any defense.
The trial court granted Bert's claim for reimbursement and rejected Mamie's allegations of collusion. In the reasons for judgment, the trial court found no evidence of collusion. Rather, the trial court stated that the litigation resulted from bad judgment and poor business decisions on the part of Lee. The trial court also found that Mamie, a well-educated woman, was aware of the obligations resulting from Bert's efforts to save the property from foreclosure by Scott. With regard to Bert's reimbursement claim, the trial court referred to the 1994 note for $150,000 given by Lee to Bert as security for the advances, expenses, and labor that Bert was providing. The trial court noted that Lee's cattle operation had been in complete ruin and that Lee would have lost everything if Bert had not stepped in when asked to take over the farm and cattle operation. The trial court found that beginning in 1993, Bert financed the cattle operation by borrowing money and selling timber and cattle. These funds were placed in the "Lee Anding Farm and Cattle Account." The trial court also determined that Bert provided considerable labor as evidenced by his own testimony and numerous work tickets submitted into evidence. Finding that Bert proved his claim for reimbursement, the trial court awarded him $55,571.68 for labor and purchases in addition to $40,491.88 for loans and advances.
The granting of Bert's claim for reimbursement and the rejection of Mamie's allegations of collusion are factual determinations made by the trial court. The trial court's findings of fact may not be set aside on appeal in the absence of manifest error or unless clearly wrong. Stobart v. State, 617 So.2d 880 (La.1993). Reversal of the trial court's factual determinations requires the appellate court to find, based on the record, that no reasonable factual basis exists for the finding and that the finding is clearly wrong or manifestly erroneous. Id. The issue to be resolved is not whether the trial court was right or wrong, but whether its factual conclusion was a reasonable one. As long as such conclusions are reasonable, the appellate court must not reverse, even if it feels it would have weighed the evidence differently. Stobart v. State, supra; Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). Where testimony conflicts, the fact finder's reasonable evaluations of credibility and inferences of fact should not be disturbed upon review. Rosell v. ESCO, 549 So.2d 840 (La.1989).
From our review of the record, we note that Mamie does not challenge Bert's reimbursement claims on the grounds that he did not loan or advance money as claimed, that he did not pay expenses, or that he did not provide a considerable amount of labor to keep the farm and cattle operation in business. She instead claims that Bert never intended to charge for his efforts and that Bert simply created the bills after the fact to prevent her from obtaining any of Lee's property in the community property partition. There was no testimony or evidence presented to suggest that the tickets, bills, and check stubs presented by Bert in support of his claim were manufactured or created only to defeat Mamie's rights in the partition. Bert testified in great detail as to each item of work performed, each expense paid, and each amount loaned or advanced. Documentary evidence was also introduced in support of Bert's claim. Bert testified that Lee, who was 90 at the time, sought his assistance in 1993 because he could no *260 longer manage. Bert explained that Lee's farm was "run down." The fences were down, machinery was broken, cattle were loose, and bills were overdue. Bert loaned money to Lee for bills and expenses and began selling timber and cattle. Bert also replenished the "Lee Anding Farm and Cattle" account as needed by taking out loans or drawing from his own or his wife's accounts. Bert also expended considerable labor over a two year period tending to the cattle. This labor included repairing fences, planting and harvesting hay, hauling loads of hulls, and feeding the cattle.
Although Bert did not send bills or statements of expenses to Lee, he did keep track of his expenses for future reimbursement. Bert testified that he intended to collect the amount due at some future time, such as upon Lee's death when he would settle the debt with his siblings. Bert's sister, Inez Anding, also testified that there were discussions about Bert receiving payment for his efforts when Lee passed away. However, Bert decided that he had to protect his interests by collecting before Lee and Mamie divided their property. There was also testimony from Mamie and her daughter Anna Coston that Bert was not charging for his labor and was not getting paid. Anna Coston testified that Bert told her that he wanted to be able to say that he did all he could to help his father. Bert countered with the explanation that he was not getting paid at the time but that he never stated that he would not charge Lee or Mamie for his efforts.
The record provides ample support for the trial court's findings of fact regarding Bert's reimbursement claim for loans, advances, and labor provided on Lee and Mamie's behalf. It is evident that Bert loaned significant sums of money and expended considerable time and labor to keep the cattle operation and farm afloat. The record also supports Bert's contention that he did intend to seek reimbursement at some point. While it appears that he expected to settle the matter with his siblings upon Lee's death, we find nothing that would prevent him from seeking reimbursement prior to the partition of Lee and Mamie's community property. Bert's efforts for which reimbursement is sought occurred prior to Lee and Mamie's separation and divorce. As such, his efforts were of benefit to both Lee and Mamie and both share in the debt. We also find no error in the rejection of Mamie's allegations of collusion. While the timing of the suit may appear suspect, the debts and claims upon which the suit are based are valid. Based on the foregoing, we find no manifest error in the trial court's awards to Bert for reimbursement.

Separate Debts
Mamie contends that she should incur no personal liability for Lee's separate debt incurred prior to their August 1968 marriage. Mamie argues that the note obligation of $167,651.98 clearly arose from transactions of Lee Anding & Son with Scott prior to her marriage to Lee. The trial court rejected this argument upon finding that the earliest debt incurred was a note signed in December 1969, over a year after Lee and Mamie married, and that Mamie failed to prove that the debt at issue is not a community obligation.
Debts incurred by a spouse during the existence of the community property regime are presumed to be community obligations. La. C.C. art. 2361. Exceptions include obligations incurred during the community property regime that are not for the common interest of the spouses or for the interest of the other spouse, and obligations resulting from an intentional wrong not perpetrated for the community's benefit or obligations incurred for separate property to the extent that there is no benefit to the community. La. C.C. art. 2363. Once it is shown that a debt arose during the existence of the community, the presumption set forth in Article 2361 may be rebutted only by facts proving the indebtedness to be a separate obligation as defined in Article 2363. Sims v. Sims, 28,470 (La.App. 2nd Cir. 6/26/96), 677 So.2d 663.
Mamie's argument overlooks the fact that the debt upon which this suit is *261 based is not the debt which Lee owed Scott. That debt has apparently been satisfied through the efforts of Bert. Even considering that Lee's initial debt at Scott stemmed from transactions that occurred prior to the 1968 marriage, the debt itself, as evidenced by the 1969 note, came into existence over a year after Lee and Mamie married and certainly during the existence of the community property regime. The record contains no evidence sufficient to rebut the presumption that the 1969 debt was a community obligation. Furthermore, the note which Bert seeks to enforce in this litigation is the 1993 note for $167,651.98 which both Lee and Mamie signed. Mamie has not put forth any evidence to rebut the presumption that the 1993 note is a community obligation. We find no error in the trial court's determination that Mamie failed to prove the debt at issue to be a separate debt.

CONCLUSION
For the reasons previously discussed, we affirm the trial court's judgment at appellant's cost.
AFFIRMED.
NOTES
[1] Lee Anding passed away after trial of this matter.